# STATE OF MICHIGAN

# COURT OF APPEALS

---

PATRICIA SOLIS and BENJAMIN SOLIS,

        Plaintiffs,

v

THE KROGER CO. OF MICHIGAN,

        Defendant/Third-Party Plaintiff-
        Appellee,

and

THE GREENER SIDE, INC.,

        Third-Party Defendant-Appellant.

UNPUBLISHED
July 26, 2016

No. 326259
Wayne Circuit Court
LC No. 12-004379-NO

---

Before: RIORDAN, P.J., and SAAD and M. J. KELLY, JJ.

SAAD, J. (*dissenting*).

Because the majority's interpretation of the indemnification provision in the contract stretches its meaning well beyond the plain language of the contract, I respectfully dissent and would hold that The Greener Side (TGS) should be granted summary disposition.

## I. STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). Defendant moved for summary disposition under MCR 2.116(C)(10), which tests the factual sufficiency of a complaint and is reviewed by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). "Summary disposition pursuant to MCR 2.116(C)(10) is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law ." *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 693; 818 NW2d 410 (2012).

Further, the proper interpretation of a contract is reviewed de novo. *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005).

## II. ANALYSIS

### A. CONTRACTUAL DUTY TO INDEMNIFY

TGS argues that the trial court erred when it ultimately ruled that TGS had a duty to indemnify Kroger and granted Kroger's motion for summary disposition. I agree with TGS.

"Indemnity contracts are construed in accordance with the general rules for construction of contracts." *Grand Trunk Western RR, Inc v Auto Warehousing Co*, 262 Mich App 345, 350; 686 NW2d 756 (2004). Thus, "unless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written." *Rory*, 473 Mich at 461. In doing so, we "give effect to every word, phase, and clause in [the] contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003).

The indemnification section of the contract between Progressive Irrigation, Inc. and TGS provides, in pertinent part, the following:

> 9. **INSURANCE AND INDEMNIFICATION:** Subcontractor takes the entire risk of any and all personal injuries or property damage *arising out of or in any way connected with the work of Subcontractor*. To the fullest extent permissible by law, Subcontractor shall indemnify, hold harmless and defend Progressive Irrigation, Inc. and Owner, their employees, agents and representatives from and against any and all damages, expenses, claims and suits of whatever nature resulting from damages or injuries, including death, to any property or persons, *caused by, arising out of, or connected with any action, omission or operation under this contract or in any connection with work attributable to Subcontractor*, any Subcontractor of Subcontractor, and any of their respective employees, agents or representatives. [Emphasis added.]

The majority's interpretation of the indemnity provision expands TGS's duty to indemnify beyond the scope of the contractual language. The indemnification provision begins with the broad statement that TGS "takes the entire risk of any and all personal injuries or property damage arising out of or in any way connected *with the work of [TGS]*." (Emphasis added.) The section further provides that TGS will indemnify against damages "caused by, arising out of, or connected with any action, omission or operation under this contract or in any connection *with work attributable to [TGS]*." (Emphasis added.) Thus, as the majority correctly observes, to trigger the indemnification provision, the alleged damages must have either been caused by, arisen out of, or otherwise be connected with (1) TGS's work; (2) TGS's action, omission, or operation under the contract; or (3) work attributable to TGS. But the majority then

-2-

fails to adequately address whether the injuries in this case were connected in any way to TGS's work under the contract.[1]

Here, the circumstances surrounding plaintiff Patricia Solis's injury did not involve TGS's work or any work attributable to it. On the day she fell, TGS did not provide any snow or ice removal services at Kroger's Canton location, nor did any other person or entity acting on TGS's behalf perform any snow or ice removal work. Similarly, because TGS did not provide services on or around December 17, 2011, it did not take any "action" or engage in any "operation" under the contract that could have resulted in Patricia's injury. Therefore, the threshold inquiry—whether the indemnity clause applies to plaintiffs' claims—turns on whether TGS's *failure* to salt Kroger's parking lot before Patricia fell was an "omission" under the contract. Accordingly, we must determine if TGS was *obligated* to perform, such that its failure to do so constituted an "omission."

To determine TGS's obligations under the contract, the Court must look to the contract itself to determine the scope of the contractual work. The pertinent sections provide:

> 1. **CONTRACT SERVICES**: Subcontractor is responsible for the satisfactory completion of *all work assigned* from the first snowfall of the season to the last, or from the date of the signing of the agreement to the last snowfall.
>
> * * *
>
> 3. **WORK**: Subcontractor agrees to furnish labor, equipment and materials as necessary to accomplish snow plowing and/or removal, sidewalk clearing, and salting services to these same area *as directed* by Progressive Irrigation, Inc. *No deviations from the work specified in the contract will be permitted or paid for* unless a written extra work or change order is first agreed upon. . . .

---

[1] Indeed, the majority makes the extraordinary claim that the indemnity clause is implicated although "it does not matter that [TGS] may have fully and properly performed under the agreement and may not in fact have caused the ice to persist or form, or that its performance or failure to perform might not have caused [Patricia's] fall." In essence, the majority takes the view that as long as any snow or ice is a factor in a plaintiff sustaining an injury, then TGS has an obligation under the contract to indemnify Kroger. But this contravenes the plain language of the contract, which requires that the injury be connected to TGS's *work under the contract*. As discussed *infra*, the contract does not impose a blanket obligation for TGS to remove *all* instances of ice from the parking lot. I emphasize that Kroger offers no evidence that the ice at issue here was in any way related to TGS's failure to perform under the contract. As a result, the majority's view turns the indemnity provision into a guaranty provision. While Kroger stated at oral argument that the indemnify provision "could not be any more inclusive," i.e., broader, I strongly disagree, as the clause simply could have provided that TGS would indemnify Kroger against all slip-and-fall claims that arose from the parking lot and sidewalk areas, without requiring that the injury must be related or connected to TGS's work under the contract.

4. **STARTING TIME:** Subcontractor agrees to promptly begin work whenever conditions warrant, or upon notification by Progressive Irrigation, Inc. or snowfall depth of one inch, whichever comes first. The Retail Store location assigned may direct the Subcontractor to begin pushing snow at an earlier accumulation.

\* \* \*

6. **GENERAL SNOW MANAGEMENT EXPECTATIONS:**

\* \* \*

> f) Salt is to be applied to Serviced Areas upon the completion of a plowing event. In the event of icing conditions with less than one inch of snow, salt is to [be] applied as needed to maintain the pavement in a safe manner.

[Italics added.]

The above language is unambiguous and makes it clear that TGS did not have an obligation to remove all instances of ice, regardless of its source. Rather, § 6(f) describes that salt is only to be applied (the only provided means for removing ice) in two circumstances: (1) upon the completion of a snowplowing "event,"[2] and (2) when "icing conditions" are present absent the presence of a one-inch depth of snowfall. Indeed, § 3 of the contract establishes that any work outside this scope is not permitted and will not be compensated.

As already noted, it is uncontested that, on and around December 17, 2011, there was no snowplowing "event," which would have required TGS to plow and salt under the contract, because there was no snow accumulation. Indeed, Patricia testified that the parking lot and surrounding grass areas were clear of any and all snow. Additionally, it is not disputed that neither Progressive nor Kroger instructed TGS to salt Kroger's parking lot during the relevant time frame.

Thus, the Court must determine if "icing conditions" were present. Because "icing conditions" is not defined in the contract, TGS would have this Court automatically construe the phrase in its favor, because it is the potential indemnitor and it did not draft the contract. "While it is true that indemnity contracts are construed strictly against the party who drafts them and against the indemnitee, . . . that principle only applies if the contract is ambiguous." *DaimlerChrysler Corp v Wesco Distribution, Inc*, 281 Mich App 240, 248; 760 NW2d 828 (2008). However, the mere fact that a contract does not define a term does not render the term ambiguous. *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 515; 773 NW2d

---

[2] According to § 4 of the contract, a snowplowing event is defined as a snowfall depth of at least one inch.

758 (2009). Rather, "'if a contract, however, inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear.'" *Id.*, quoting *Raska v Farm Bureau Mut Ins Co of Mich*, 412 Mich 355, 362; 314 NW2d 440 (1982).

In determining the plain and ordinary meaning of a term or phrase, this Court has resorted to dictionary definitions for guidance. *Vushaj*, 284 Mich App at 515. According to *Merriam Webster's Collegiate Dictionary* (11th ed), "condition" has several different meanings. As used in the contract, "condition" means "a state of being" or "attendant circumstances," while "icing" means "to coat with or convert into ice" or "to become covered with ice." *Id.* When the two terms are combined and considered in the context of the contract, the phrase "icing conditions" refers to a state where the parking lot gets covered or coated with ice. We do not read this to cover instances of *any* ice formation, such as from a customer emptying a container of water onto the parking lot that later freezes into ice. In other words, in order to have such a large-scale condition that "cover[s] or coat[s]" the area as a whole, it must be related to the environment somehow (e.g., snow, piled snow melting, frozen rain, rain followed by freezing temperatures, etc.).

In this case, there were no "icing conditions" on the morning of December 17, 2011, that would have triggered TGS's duty to salt Kroger's parking lot. Patricia testified that the weather that morning was "cold," and Kroger produced weather reports that indicated that the temperature ranged from 31 to 28 degrees. However, although water *can* form into ice with these below-freezing temperatures, there was no objective reason to believe the ice *would* form. Importantly, there was *no* precipitation that day, and there was no standing snow, which could have melted and reformed as ice on the ground. Additionally, there was no evidence concerning the source of the ice. In fact, in support of its motion for summary disposition regarding the underlying premises liability action, Kroger hypothesized that "the ice may have developed a few minutes before Plaintiff's fall, or the ice may have formed from a spill made by another customer, or due to some condition related to the sewer." None of these situations can be categorized as an "icing condition" under the contract.

In sum, the indemnification provision only applied to damages that were caused by, arose out of, or were otherwise connected with (1) TGS's work; (2) TGS's action, omission, or operation under the contract; or (3) work attributable to TGS. Because TGS did not have a duty to perform, its failure to do so was not an "omission" under the contract, and TGS's failure to salt was thus not connected with its work under the contract. Therefore, I would hold that the factual predicate of plaintiffs' premises liability action did not trigger TGS's indemnification obligations under the contract and that summary disposition should have been granted to TGS.

## B. CONTRACTUAL DUTY TO DEFEND

In its motions for summary disposition and reconsideration, Kroger also alleged that TGS's duty to defend was separate and distinct from its duty to indemnify. According to Kroger, TGS had a duty to defend it against plaintiffs' complaint because the allegations therein "arguably" implicated TGS's contract and services. Quoting *Citizens Ins Co v Secura Ins*, 279 Mich App 69, 75-76; 755 NW2d 563 (2008), Kroger argues that "[i]t is settled that the *insurer's* duty to defend is measured by the allegation in plaintiff's pleading. The duty to defend does not

depend on *insurer's* liability to pay." (Emphasis added.) Defendant's argument in this regard lacks merit because it mischaracterizes its relationship with TGS. TGS is not Kroger's insurer.

In *Grand Trunk*, this Court acknowledged that indemnification jurisprudence has been primarily derived from insurance and construction cases, but held that "[t]he general rules of contractual indemnity apply to claims of indemnity in commercial transactions, rather than the specific rules governing an insurer's duty to defend." *Grand Trunk*, 262 Mich App at 353. The contract at issue in *Grand Trunk* first set forth the types of claims that the defendant would indemnify, then stated that the defendant would undertake the defense of "such claims" upon tender of the defense. *Id*. at 352. The Court determined that, based on the cross reference between the claims that would be indemnified and the claims that would be defended, the defendant's duty to defend was not absolute, but rather coincident with its duty to indemnify. *Id*. at 353-354. Therefore, unlike an insurer's duty arising from an insurance policy, the indemnitor's contractual duty to defend was not broader or separate from its indemnification obligation. *Id*. at 354.

In this case, the contract states that TGS "shall indemnify, hold harmless and defend Progressive Irrigation, Inc. and Owner" against specified types of claims. The contractual language in *Grand Trunk* set forth the defendant's duty to defend in a separate paragraph but limited that duty by reference to "such claims" that would be subject to indemnification. The reasoning of the *Grand Trunk* Court is no less applicable here because the contract provides a single description of the claims that TGS would indemnify *and* defend against. Thus, like in *Grand Trunk*, TGS's duty to defend is coincident with its duty to indemnify. Accordingly, for the same reasons TGS was not obligated to indemnify Kroger, I would hold that it also did not have a duty to defend Kroger in the premises liability action.

## C. BREACH OF CONTRACT

In addition to its indemnification and defense claim, Kroger's third-party complaint included a breach of contract claim, which the majority declined to address. In its complaint, Kroger alleged that TGS agreed to name Kroger as an additional insured on its insurance policy but breached the contract by failing to "provid[e]" the insurance. Section 9 of the contract provides that

> [TGS] agrees to obtain and pay for at its expense, from and insurance company with "A" rating or better that is licensed to operate in the State of Michigan, the following insurance coverage:
>
> * * *
>
> b) General Liability insurance, including Commercial General Liability, Occurrence Basis, Products and Complete Operations, with not less than $3,000,000 per occurrence;
>
> * * *
>
> Prior to commencing any work or receiving any payments from Progressive Irrigation, Inc., Subcontractor shall provide Progressive Insurance, Inc. with a

valid certificate of insurance confirming the required coverage and naming Progressive Insurance, Inc. and the Owner as additional insured's [sic].

"A party claiming a breach of contract must establish (1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *Dunn v Bennett*, 303 Mich App 767, 774; 846 NW2d 75 (2014) (quotation marks and citation omitted).

In this case, the first element is not at issue because, although it is not a party to the contract between Progressive and TGS, Kroger nonetheless is a third-party beneficiary who stands in the shoes of the promisee, Progressive. See MCL 600.1405(1); *White v Taylor Distributing Co, Inc*, 289 Mich App 731, 734; 798 NW2d 354 (2010).

With regard to the second element, it appears that TGS did breach the contract by failing to provide to Progressive a "valid certificate of insurance confirming the required coverage and naming" Kroger as an additional insured.[3]

Regardless, assuming that TGS did breach the contract by failing to include Kroger as an additional insured to its general liability policy, Kroger failed to prove that it was damaged as a result of this breach. Notably, the contract does not obligate TGS to provide Kroger with a separate general liability insurance policy—it merely requires that Kroger be named as an additional insured under TGS's general liability insurance. Accordingly, because Patricia's injury was not related to TGS's work within the scope of the contract, any insurance coverage Kroger could have acquired through TGS would also be inapplicable to plaintiffs' claims. See Conger, Lynch & Rentz, Construction Accident Litigation (2d ed), § 10:10 ("Modern contract provisions frequently specify that the party for whom insurance is to be obtained is to be listed as an additional insured on the policy. Parties so insured have no greater rights than those of the named insured.").

Therefore, Kroger is not entitled to summary disposition because Kroger failed to prove that any such breach caused it any damages. Indeed, because (1) TGS's insurance would only cover incidents related to TGS's scope of work and (2) Patricia's accident was not connected

---

[3] We note that TGS later did produce a declaration page for its insurance policy with Secura, which includes the following language: "ADDITIONAL INSURED WRAP (ILE1037) WHEN REQUIRED BY WRITTEN CONTRACT FOR OPERATIONS . . . ." Arguably, Kroger would be an additional insured under the Secura policy because a written contract required TGS to include Kroger as an additional insured. However, because Kroger is not an explicitly named insured in the Secura policy, it cannot be determined if the Additional Insured Wrap applies to Kroger's liability to plaintiff without reviewing the terms of Secura's policy. Yet, without Secura's participation, such a determination would be inappropriate because it would necessarily involve an adjudication affecting the rights of a nonparty. See *Shouneyia v Shouneyia*, 291 Mich App 318, 323; 807 NW2d 48 (2011).

with this work, Kroger cannot establish the necessary element of damages on its claim. Accordingly, I would hold that TGS is entitled to summary disposition on Kroger's breach of contract claim as well.

Accordingly, I would reverse and remand for reinstatement of the trial court's June 20, 2013, order that granted summary disposition in favor of TGS.


/s/ Henry William Saad